## BAEDER v. JENNINGS.

*(Circuit Court, D. New Jersey. October 18, 1889.)*

1. PUBLIC LANDS—SURVEYS—APPOINTMENT OF DEPUTY SURVEYOR.
   Where it appears that one who purported to make a survey, as deputy surveyor, in 1690, was a man of high position, identified largely and in many ways with the proprietary affairs, and afterwards surveyor general, and that he had made and returned a great number of surveys as deputy surveyor, which the council of proprietors allowed to remain on their records without protest, it will be held that he was a regular deputy surveyor when he made the survey in question, though there is no record of his appointment.

2. SAME—WARRANTS—EVIDENCE—RECITAL IN ANCIENT SURVEY.
   A recital, in a survey made in 1690, that a warrant had been issued, is presumptive proof of the fact, not to be questioned without some evidence to the contrary.

3. SAME—SURVEYS—PRESUMPTION FROM LAPSE OF TIME.
   After the lapse of 200 years, it must be presumed that a survey regularly entered on the books of the proprietors, and never objected to by them, was entered with their consent and approbation.

4. SAME—NECESSITY FOR ISSUE OF PATENT.
   A survey made in 1690, by a regular deputy surveyor, and officer of the proprietors, returned to their office, and duly entered on their books without objection, constitutes a good title in New Jersey, and a patent is not necessary to vest title.

5. SAME—NEW JERSEY ACT OF 1787.
   Act N. J. June 5, 1787, which declared that any survey made of any lands within either the eastern or western division of the proprietors of the state of New Jersey, and inspected and approved of by the general proprietors or council of proprietors, and by their order entered upon the record, should, from and after such record was made, preclude and forever bar the proprietors and their successors from any demand thereon, applied to surveys made and recorded before its passage.

6. SAME—CONSTITUTIONAL LAW—RETROSPECTIVE OPERATION.
   To give the act retrospective operation does not make it unconstitutional, as the constitution of New Jersey had no provision on the subject, and the constitution of the United States had not been adopted when the act was passed.

7. SAME—WEST JERSEY SOCIETY—QUASI CORPORATION.
   Daniel Cox, who was a large proprietor of West New Jersey, governor of the colony, and invested with the powers of government therein, in 1692 disposed of all of his properties to an association of 70 persons, to be distributed among them according to their respective interests. The deed was to two, to the use of the shareholders. At the same time he granted to the same persons the right and powers of government in West New Jersey. These associates assumed the powers of government, made regulations for the management of their affairs and the conveyance of their lands, etc. They acted and were treated as a corporation, and were so treated by the proprietors of East Jersey, under whom defendant claimed, in respect to their ownership of the properties in East Jersey purchased from Cox. They held and conveyed large tracts of land, and were recognized by the name of the "West Jersey Society" in courts and by the legislature. *Held,* that the society was a *quasi* corporation, with power to convey lands by its corporate officers, viz., president, vice-president, and committee.

**8.** SAME—POWER OF ATTORNEY—EXECUTION BY CORPORATION.

On February 1, 1749, the society, by its president, vice-president, and committee, executed a power of attorney to sell its lands in New Jersey. The paper was executed not only under the hands and seals of the officers, but under the common seal of the society, and its execution was duly proved by the subscribing witness before the lord mayor of London, and was duly recorded. *Held*, that the paper was a corporate document, duly executed by the society.

**9.** DEEDS—ANCIENT DEEDS—AUTHENTICATION—EVIDENCE.

The various deeds and grants by which Daniel Cox derived title to shares of property in East Jersey, and conveyed them, 71 in number, were among a large lot which remained in the repositories of the West Jersey Society in London from the early part of the reign of William and Mary to the middle of the last century. They were then sent to the society's agent in New Jersey, after being registered in the office of a notary in London, carefully identified by the oaths of the notary and the secretary before the lord mayor of London, and by the oath of the captain of the ship who brought them over, and were recorded in West Jersey. Their validity and existence had been fully recognized by the proprietors of East Jersey. *Held*, that they were sufficiently authenticated to entitle them to record, and were properly received in evidence in an action between one claiming under them and a grantee of the proprietors of East Jersey.

**10.** SAME—ACT OF 1743.

The act of 1743, which merely declared that certain acknowledgments or proofs theretofore taken should be deemed sufficient to authorize the deeds to be recorded, did not declare that no other proofs should be insufficient.

**11.** SAME.

The failure to record them in East Jersey is not material to the question of the existence of such deeds.

**12.** SAME—ANCIENT DEED—PROOF BY RECITAL.

A deed alleged to have been executed in 1772, forming a link in plaintiff's chain of title, was not produced, but a deed executed in 1823, more than 60 years before defendant undertook to take possession, was produced, which recited the existence of the deed of 1772. The grantors in the deed of 1823 had exercised various acts of ownership. *Held*, that the recital was admissible to prove the existence of the deed as against defendant.

**13.** EVIDENCE—PROCEEDINGS IN PARTITION.

Proceedings in partition in 1818 were introduced, but the original petition, and the order for the appointment of commissioners, were missing. There were shown the report of the commissioners dividing and allotting the land, a map of the premises, and their allotments, and an order of the court directing the report to be filed. *Held*, in consideration of the lapse of time, and possession of the property in conformity with the division, that the proceedings were admissible.

**14.** SAME—ADMINISTRATOR'S DEED.

A recital, in an administrator's deed, of an order of sale, is sufficient presumptive proof, 40 or 50 years after the date of the deed, of such an order; the possession being conformable to the deed.

At Law.    In ejectment.

On rule to show cause why verdict should not be set aside, and a new trial granted.

This rule came on to be argued, by agreement of the parties, before Mr. Justice BRADLEY, at his chambers, city of Washington, 11th February, 1889.

At the trial of the cause before Judge WALES, at Trenton, September term, 1887, a stipulation was made between the parties as follows:

"It is on this 28th day of September, 1887, agreed by and between the respective attorneys of the above parties that at the close of the testimony both parties shall rest; that a *pro forma* verdict shall be taken for the plaintiff; that an application for a rule to show cause why a new trial should not be had shall then be made by the defendant's attorney, which rule to show cause, by consent of plaintiff's counsel, shall be allowed; that the attorneys of the respective parties shall each furnish to the other side a brief of the points and cases relied upon, at least 20 days before the argument of the rule, the defendant first presenting the plaintiff his briefs, to which the plaintiff shall

reply; that the rule shall be argued at such time and place as shall be directed by the court upon the points raised by the record, and relied upon in the respective briefs above mentioned.

[Signed]     "I. W. CARMICHAEL, Atty. of Deft.
[Signed]     "GARRISON & FRENCH, Attys. of Plff."

The report of the proceedings shows that, after the evidence was closed, the judge, referring to this stipulation, charged the jury as follows, to-wit:

"*Gentlemen of the Jury:*   Counsel on both sides have come to a stipulation which is a very convenient one for both you and the court.   You observe that the case is a very intricate one, the testimony involving the examination of old records and ancient statutes,—colonial statutes,—which the court would have had to make itself familiar with, and give you an opportunity to investigate them; but counsel have come to a conclusion to let you render a verdict, and the matter will be argued hereafter on a motion for a new trial, and the court will decide whether your verdict will stand or be set aside."

Thereupon the jury brought in a verdict for the plaintiff.

The motion was argued on the whole evidence in the cause, and the question was whether the evidence was sufficient to sustain the verdict in favor of the plaintiff; in other words, whether the rule to show cause should be made absolute or discharged.

*Garrison & French* and *P. L. Voorhees,* for plaintiff.
*I. W. Carmichael* and *B. Gumere,* for defendant.

BRADLEY, Justice.   The land for which the action was brought, as described in the declaration, is a parcel of 5 acres and 61 hundredths of an acre, situate on Long Beach, in the township of Eagleswood, in the county of Ocean, and state of New Jersey, being to the east of the line between East and West Jersey, bounded south-easterly by the Atlantic ocean, and north-easterly by the line between lots numbered 17 and 18 of the Cox patent, as divided by J. S. Earl and others in the year 1818, and being part of said lot No. 18.   The plaintiff set up two grounds of title:   *First,* by grant from the proprietors of East Jersey to Daniel Cox in 1691, and deduction of title to the plaintiff; *second,* by continuous possession under claim of title for a long period of time, to-wit, more than 20 years before the defendant took possession.   The defendant claimed title under a warrant for 10,000 acres of land from the proprietors of East Jersey to Charles E. Noble, trustee for themselves, issued in 1884, and a survey thereunder to said trustee, dated March 18, 1886, duly returned and recorded, and a deed of conveyance from Noble to the defendant.   Of course, the defendant relies upon his possession, and claims that the plaintiff must prove title in herself; but it is not pretended that the defendant acquired possession in any other manner than under the said survey of 1886, made for the use of the proprietors.   The controversy is really with them.   The links in the chain of documentary title on which the plaintiff relies are as follows, to-wit:

1. Certain deeds of conveyance vesting in Daniel Cox two shares of propriety in East New Jersey.   These deeds are:   *First.* One from Edward Byllynge, one of the original 24 proprietors of East Jersey,

(see Leaming & Spicer, 73,) being a lease and release for one share, dated 19th and 20th of March, 2 Jas. II., (1685–86;) *second*, a deed from the widow and heir of William Gibson, another of the original 24 proprietors, to Thomas Cox, for one share, dated 6th April, 3 Jas. II., (1687;) and a deed from Robert West and Thomas Cox to Daniel Cox, for the same share, dated 4th December, 1 W. & M., (1689.) These deeds, if duly authenticated, show that Daniel Cox—who, history tells us, was not only a noted person at court, being physician to the queen of James II., and to Princess, afterwards Queen, Anne, but a very prominent man in the affairs both of East and West Jersey —was the owner of two shares of propriety in 1689. It will be seen that he disposed of them to the West Jersey Society in 1692. But in the mean time he made other deeds or mortgages affecting these shares. The records show that he conveyed the first share, purchased from Byllynge, to one Samuel Stancliff, in April, 1687, and that Stancliff got out a warrant for 10,000 acres of land upon it, but whether he ever procured surveys therefor is not shown. It would seem that this conveyance was by way of security or mortgage, and that the share was reconveyed to Daniel Cox; for, in January, 1690–91, Cox conveyed the same share to John Hyde and John Haskins by way of mortgage; and they joined him in releasing it to the West Jersey Society, in March, 1692, soon after the conveyance of his property in America to that association, as will presently be mentioned. The other share, derived from the Gibson estate, was also mortgaged by Daniel Cox to Robert West and Benjamin Wetton, by lease and release, dated 5th and 6th of June, 2 W. & M. (1690;) and these persons joined him in a quitclaim to the West Jersey Society, in March, 1692. The records and certified copies of all these conveyances were produced in evidence on the trial. The objections to their reception will be noticed hereafter. Meanwhile it is pertinent to observe here that they were recognized by the proprietors of East Jersey, as will presently appear.

2. The next link in the plaintiff's chain of title is a survey to Doctor Daniel Cox, returned and entered October 7, 1691, for 2,400 acres of meadow at Little Egg Harbor beach, which it is conceded embraces the premises in question. The plaintiff first introduced a resolution of the council of proprietors, adopted May 20, 1690, as follows:

"Forasmuch as this board is given to understand by the surveyor general that there is at least 24,000 acres of meadow at Barnegat, it is therefore agreed and ordered that each propriety have allotted to it 1,000 acres of the said meadow, and that warrants be granted to each proprietor, and such other person or persons, their equal quantity, according to each one's proportional share in a propriety as they now hold, when desired, and that all the upland adjoining to the said meadows be granted to such of the said proprietors as desire the same, provided it join their own meadow."

Several of the proprietors availed themselves of this resolution, and took up lands at the Barnegat meadows and on Little Egg Harbor beach, and took patents therefor. Four of these patents were produced in evidence,—one to Peter Somans, dated 24th May, 1690, for 6,300 acres,

partly on the beach; one to A. Gordon, of same date, for about 4,000 acres, embracing 3 miles of the beach; one to Thomas Hart; and one to William Dockwra,—all including portions of the beach in continuous tracts. The tenor of the survey to Dr. Cox is as follows, to-wit:

"By warrant from the proprietors of East New Jersey, dated May 20, 1690, surveyed and laid out for Doctor Daniel Cox, (in right of two proprieties,) two thousand four hundred acres of meadow and upland at Barnegat, in two tracts: The first on the beach of Little Egg Harbor, beginning at the north side of the mouth or opening of the harbor on the point of the beach, or the beginning of the partition line betwixt East and West Jersey, and running north-easterly, as the beach goes, six miles, more or less, to Peter Soman's line in length, and from the sea to the bay in breadth, including all the meadows and islands adjoining on the side of the main channel of the sound or bay, bounded east by the sea, south by Little Egg Harbor, west by the channel of the bay, north by Peter Soman's. The other tract on the main side of the bay, opposite to the last-mentioned tract, beginning," etc., (describing the same.) "Also, five hundred acres of land at Wickatunk, which is his lot there, being number twenty-three, beginning," etc., (describing the same.) "Also five hundred acres of Topenenny, which is his lot there, being number eleven, beginning," etc., (describing the same.) "Also a home lot, being 24 chains in length, and 12 chains in breadth, bounded north-west by land unsurveyed, north-east by Thomas Warne, south-east by Robert Barclay, south-west by a highway.        [Signed]              JOHN BARCLAY."

This survey has an entry in the margin, as follows, to-wit: "Entd. 7 Oct. 1691." It is objected that there is no proof that John Barclay was a deputy surveyor in 1690 or 1691. It is hardly credible that a man of his high position, a son of the then recent governor, Robert Barclay, himself identified largely and in many ways with the proprietary affairs, a member of the council, and afterwards appointed surveyor general, (April, 1692,) would have ventured to act as a deputy surveyor if he had not been duly authorized so to do. It is hardly credible that the council of proprietors would have allowed his surveys (and there are great numbers of them) to have remained on their records without some protest, if he had not held a commission as deputy surveyor. I think that they, and all claiming under them, are estopped from denying his authority. We have the positive testimony of the historian, William A. Whitehead, Esq., in his "Contributions to the Early History of Perth Amboy," (page 42,) that in January, 1688, John Barclay was appointed deputy surveyor under George Keith, and succeeded him as surveyor general, April 6, 1692. His appointment as deputy, it seems, was not recorded, and has been lost in the 200 years which have since intervened. But I cannot think that this should vitiate his surveys. I have no hesitation in holding that he was a regular deputy surveyor of the proprietors when he made the survey in question.

Nor have I any greater hesitation in holding that it will be presumed that a warrant was issued as recited in the survey. No warrant was produced on the trial, and that was made a ground of objection to the survey. That there was such a warrant is evidenced by the recital. This is presumptive proof of the fact, not to be questioned at this late day without some evidence to the contrary.

Some suspicion is sought to be cast on the book in which the survey is recorded, Book O. This is very strange indeed. Hundreds of surveys are only to be found in this book. It is of public consequence to the citizens of New Jersey that it should be carefully preserved. In the schedules annexed to the Elizabethtown bill, the proprietors themselves largely refer to it as the authority for many of the surveys which they cited as evidence of their acts of ownership, and of submission to their claims as proprietors, over the lands in dispute in that case. Book O and Book 2 of Surveys are very important records, and a transcript of them should be deposited in the office of the secretary of state at Trenton. It is strange that it has never been done.

But supposing the survey genuine and authentic, and made by a proper officer, it is still objected that it is insufficient to vest the title in Daniel Cox without a patent; and no patent was produced. It is conceded that no patents have been issued since the surrender of government, in 1702; the titles granted since then all resting on the surveys alone. If a patent was necessary before, why is it not necessary since? No law was ever passed to dispense with a patent; yet no one supposes that it is necessary, in order to perfect the title. It is merely a question of regulation. A patent, it is true, is authentic evidence of a title; but it is the survey and return that segregate the land from the common domain. Daniel Cox was one of the proprietors, owning one-twelfth of the whole province. His title, therefore, was already perfect. The survey and return were sufficient to segregate the lands, and set them apart to his use. See the observations of Chief Justice KIRKPATRICK in *Arnold* v. *Mundy*, 1 Halst. 67–69. Perhaps a non-compliance with the regulations might have authorized the board of proprietors, within a reasonable time, to vacate and set aside the survey in a regular way; but, until thus set aside, it seems to me it stands good. A survey made by a regular deputy surveyor, an officer of the proprietors, returned to their office, and duly entered in their books without objection, (as this was,) has always been deemed a good title in New Jersey. A statute was passed on the 5th of June, 1787, declaring "that any survey made of any lands within either the eastern or western division of the proprietors of the state of New Jersey, and inspected and approved of by the general proprietors, or council of proprietors of such division, and by their order or direction entered upon record in the secretary's office of this state, or in the surveyor general's office in such division, shall, from and after such record is made, preclude and forever bar such proprietors and their successors from any demand thereon, any plea of deficiency of right or otherwise notwithstanding." Revision N. J. p. 599, § 3. It is contended that this act is not retrospective, and does not apply to surveys made prior to its passage, and would be unconstitutional if it did. If it does not apply to surveys made and recorded before its passage, it would be of little use. In terms, it applies to all surveys; and the evil to be remedied related to past as well as future surveys. The previous section of the same act, making 30 years' actual possession, under certain circumstances, a bar to all prior locations, is

careful to give to parties 5 years to sue after the passage of the act. That section was certainly intended to be retrospective, and yet it is couched in no more absolute terms than the section under consideration. As to the allegation that a retrospective effect given to the act would make it unconstitutional, an obvious answer is that the constitution of New Jersey had no provision on the subject, and the constitution of the United States had not yet been adopted when the act was passed. In my opinion the survey produced was sufficient. After 200 years, it must be presumed that a survey regularly entered on the books of the proprietors, and never objected to by them, was entered with their consent and approbation.

3. The next link in the chain of the plaintiff's title is the conveyance of the land described in the survey of October, 1691, by Daniel Cox to the West Jersey Society. This is proposed to be shown by certified copies of several deeds offered in evidence for that purpose. Daniel Cox had become a large proprietor of West New Jersey, and was governor of that colony, and was invested with the powers of government therein. That colony was divided into hundredths, of which Cox held 20, besides large tracts of land which had been segregated, and large colonial interests in other parts, Minisink, etc. In the beginning of 1692, Cox disposed of all these vast proprieties to an association of some 70 different persons, to be held in 1,600 shares, distributed among the parties according to their respective interests. By deeds dated the 4th day of March, 1691–92, he conveyed to Jonathan Greenwood and Peter Guyon, to the use of the shareholders, all his proprietary rights, and all his property in West Jersey and in Minisink, and his two proprietary rights in East Jersey, besides other property specified, and concluding with general words conveying "all his, the said Daniel Cox's, parcells and tracts of land known by the name of 'towne lots,' situated and being in or near Gloucester towne and Egg Harbor, in West Jersey, aforesaid, and all other the lands, tenements, and hereditaments in America whatsoever of him, the said Daniel Cox, whereof or whereon he, the said Daniel Cox, or any other person or persons in trust for him or to his use, is or are standeth or stand seized of any estate," except certain lands referred to, not connected with this controversy. By a deed of the same date, (March 4, 1691–92,) not offered in evidence, but constituting an important document in the public political history of New Jersey, Daniel Cox granted and conveyed to the same persons the right and powers of government in West New Jersey. (These two deeds are copied in the New Jersey Archives, vol. 2, pp. 41, 64.) By another deed executed in the following January, (1692–93,) Daniel Cox released to the same parties a certain charge reserved in the first deed on one-third of the property, as security for part of the purchase money, and conveyed to them 4,000 acres of land in West Jersey, part of a tract which had been reserved by John Fenwick to himself, and an additional half propriety in East Jersey, which had been conveyed to him (Cox) by Robert West. The associates to whom Cox thus conveyed his interests assumed the powers of government over West Jersey, appointed the governor, made

regulations about the management of their affairs, the conveyance of their lands, etc. (See their Articles of Agreement, copied in New Jersey Archives, vol. 2, p. 73, which is an historical document. A certified copy of these articles was produced in evidence.) They appointed a standing committee to act for the body, consisting first of eleven, afterwards of nine, persons. They acted and were treated as a corporation. They were certainly a corporation *de facto*, and I think a corporation *de jure;* as much so, and with as much authority, as the proprietors of East New Jersey, whose corporate capacity has never been questioned. Exercising the powers of government, they were a law unto themselves, and a corporation of mere right. They were treated this way by the proprietors of East Jersey, in respect to their ownership of the two and one-half proprieties of that province which they had purchased from Daniel Cox. In 1745 the proprietors of East Jersey filed a bill in the court of chancery of the province against a large number of persons in the vicinity of Elizabethtown, who claimed certain lands adverse to the proprietors, which bill was called the "Elizabethtown Bill," already referred to; and the West Jersey Society is one of the most prominent of the parties complainant in this bill, being named, in the order of dignity, next after the earl of Stair and the Penns. The bill commences thus:

"*To his Excellency Lewis Morris, Captain General and Governor, etc.:* Humbly complaining, show unto your excellency your orators, John, earl of Stair, John Penn, Thomas Penn, Richard Penn, [John Child, Levy Ball, Francis Minshull, Joseph Mico, Henry Greenaway, and Thomas Knap, in behalf of themselves and other proprietors of the eastern division of New Jersey, commonly called and known by the name of the ' New Jersey Society,'] Samuel Neville,"—

—and about 20 others, describing themselves as "general proprietors of the eastern division of New Jersey, in behalf of themselves and the rest of the general proprietors of the said eastern division of New Jersey." Those in brackets are the committee of the West Jersey Society, called in the bill the "New Jersey Society." Their title to the two and one-half shares of propriety before referred to is set forth in the bill, and in Schedule 2 thereto annexed. In the bill they say as follows, to-wit:

"And your orators, John Child, Levy Ball, Francis Minshull, Joseph Mico, Henry Greenaway, and Thomas Knap, in behalf of themselves and the rest of those called the ' New Jersey Society,' do show unto your excellency that, by sundry mean conveyances under the said Edward Billing, William Gibson, and Robert West, they stand seized of and entitled in fee-simple unto the whole of those two proprieties, or 24th parts of East New Jersey aforesaid, formerly belonging to the said Edward Billing and William Gibson, and to one-half of that propriety or 24th part formerly belonging to Robert West;"

—And they refer to said Schedule No. 2 for the derivation of title to the said two and one-half proprieties, which exhibits the same deeds of conveyance through Daniel Cox before referred to. This presentation of title is binding as an admission, both on the West Jersey Society and on the proprietors of East Jersey, and effectually disposes of the objections to the title of Daniel Cox to those proprietary shares in 1690 and 1691, when the survey of the Barnegat or Little Egg Harbor beach was made

to him. The West Jersey Society, or, as sometimes called, the "West New Jersey Society," and the "New Jersey Society," long held immense tracts of land in West Jersey, as well as considerable tracts in East Jersey, and a great many titles are dependent upon their deeds of conveyance. It is too late, at the present day, to doubt of the corporate or *quasi* corporate capacity of this association, and its power to sell and dispose of its lands by its corporate officers. It has been recognized by the legislature of New Jersey. Near the close of the Revolutionary war, on the 5th of October, 1781, the legislature passed an act for the protection of its property, entitled "An act for vesting the powers of agency for the West Jersey Society in Joseph Reed, esquire, one of the said society." The preamble of the act is as follows:

"Whereas, the said Joseph Reed hath, by his petition, represented, that on or about the 4th April, 1692, Sir Thomas Lane, knight, Michael Watts, esquire, and divers other persons, then residing in the kingdom of Great Britain, associated together by the name of the 'West Jersey Society,' for the purpose of locating and improving lands in North America, and did accordingly purchase of Doctor Daniel Coxe divers lands, tenements, and rights or propriety in West Jersey, East Jersey, Pennsylvania, and New England," etc.

The act then gives power to Reed to protect the society's property, to rent it, etc., for the period of seven years, unless he should sooner be superseded by another agent. This was rendered necessary from the fact that many, if not most, of the associates, resided in Great Britain, and could not look after their interests during the continuance of the war. It appears by the articles of association of the society, and the instance of the Elizabethtown bill, that the society acted by its president or vice-president and standing committee, which was annually elected.

4. On the 1st of February, 1749–50, the West Jersey Society, acting by its president, vice-president, and committee, executed a power of attorney to Henry Lane and Lewis Johnston, authorizing them and either of them to sell and dispose of its lands in New Jersey, and do other acts specified in the power. This paper was executed, not only under the hands and seals of the officers, but under the common seal of the society. Its execution was duly proved by John Stephenson, the subscribing witness, before the lord mayor of London, and was duly recorded. I consider it a corporate document, duly executed by the society, under its corporate seal, and by its usual officers.

5. The next link in the plaintiff's chain of title is a deed for the Cox survey from the West Jersey Society, executed by their said attorneys, Lane and Johnston, to James Haywood, and dated April 1, 1751. The execution of this deed was acknowledged by one of the attorneys before the Honorable James Alexander. It is objected that both of the attorneys should have acted. The *testimonium* clause shows that they did, but only one acknowledged the execution. This was sufficient, as the power to sell was conferred upon both or either of them. The title then proceeds as follows:—

6. A deed of conveyance of the same property, dated March 26, 1762, from James Haywood to 20 different persons, including, among others,

John Monro, Edward Tomkins, John Leonard, William Newbold, Anthony Sykes, Benjamin Gibbs, and John Chapman. (A certified copy of this deed was produced, showing it to have been regularly acknowledged and recorded in the office of the secretary of state, May 30, 1762.)

7. A deed from John Chapman to Joseph Newbold, dated October 8, 1772, for one-half of his one-twentieth interest in said lands, and to Caleb Shreve for one-fourth of said twentieth. (This deed was not produced, but is recited in the deed from William and Clayton Newbold and others to Samuel Deacon and Simeon Haines, hereafter stated.)

8. A quitclaim deed from Benjamin Gibbs to his co-tenants, dated December 20, 1775, for his one-twentieth of said lands; so that the shares held in common became 19 in number, instead of 20. (This deed was not produced on the trial, but is recited in a certain deed, which was produced, from George Sykes to Thomas P. Sherborne, Jr., for a portion of lot No. 13, set off to John Leonard in the proceedings in partition hereinafter stated.)

9. Will of Joseph Newbold, dated 27th March, 1790, proved 19th May, 1790, devising his interest to Clayton Newbold; and will of said Clawton Newbold, dated 26th May, 1808, proved 18th September, 1812; devising the same to William and Clayton Newbold. Also the devolution by descent of Caleb Shreve's interest to his children and heirs at law; to three of whom, Benjamin, Caleb, and Reuben, the others released their interest.

10. Proceedings in partition for the division of the Daniel Cox survey among the said 19 shares; said partition being executed on the 1st of December, 1818, by John Collins, Jr., Charles F. Lott, and Joshua S. Earle, appointed commissioners for that purpose by Hon. WILLIAM ROSSELL, second justice of the supreme court of New Jersey, on the 18th of June, 1818, on the application of Samuel Sykes, one of the heirs of Anthony Sykes, deceased; which commissioners made their report on the 9th day of December, 1818, and on the 12th of the same month the said report was presented to the said justice, and by him ordered to be filed in the clerk's office of the supreme court at Trenton, and the same was filed accordingly, together with a map thereto annexed, showing the several parcels into which the said commissioners divided the said lands. None of the proceedings in said partition were produced on the trial, except a duly-certified copy of the commissioners' report and map, and the order of the judge indorsed thereon, declaring that he had examined the within report, and directing the same to be filed as aforesaid, and a statement of the expenses of said partition, it being alleged that the other proceedings could not be found. This partition was cited and referred to in several deeds for various portions of the Cox survey, given in evidence for that purpose. In this partition, the lines of division between the several portions into which the tract was divided, extended across the tract from south-east to north-west, and the several portions were numbered from 1 to 19, beginning at the north end, and extending southwesterly to the old inlet of Little Egg Harbor. Lot No. 18, containing 194 acres, was the last lot bounding on the ocean. No. 19 (still fur-

ther south) was bounded by the inlet. All the lots extended back to the channel of Little Egg Harbor bay. Lot No. 18 fell to the share of John Chapman, then (in 1818) belonging, one-half thereof to William and Clayton Newbold, and one-quarter thereof to Benjamin, Caleb, and Reuben Shreve. William and Clayton Newbold claimed the remaining fourth of that share by virtue of paying the share of the expenses due from it, no one appearing to claim the same, or to pay said expenses. The judge had power, by the law, to order a sale of any share whose owner failed to pay a proportionate part of the expense, and one or more of such sales seem to have been made.

After this partition the next links in the plaintiff's chain of title were—

11. A deed dated 4th March, 1823, from William and Clayton Newbold, and Benjamin, Caleb, and Reuben Shreve, to Samuel Deacon and Simeon Haines, for the one-half of the John Chapman share owned by the Newbolds, and the one-fourth owned by the Shreves; and another deed of same date from William and Clayton Newbold to said Deacon and Haines for all their right, title, and interest in the remaining fourth. (The originals of these deeds were produced, duly acknowledged.) The first contains a recital of the deed from John Chapman to Joseph Newbold and Caleb Shreve, dated October 8, 1772, before referred to; and of the partition just described, and the allotment of lot No. 18 to the representatives of John Chapman.

12. A deed dated 31st May, 1823, from Samuel Deacon and Simeon Haines to William Elliott, George Armitage, John Kenworth, Marine Tyler Wickham, Charles Eaton, and Joseph Few Smith, conveying the said three-fourths and one-fourth of the John Chapman lot (No. 18.) (The original of this deed was produced, duly acknowledged.)

13. A deed dated 20th May, 1824, for the same lot, No. 18, from the last-named grantees (who are declared to hold in trust for the Long Beach Sea-Shore Company) to George Armitage, Marine Tyler Wickham, and James Baker, in trust for the uses and purposes declared in certain articles of association of the said company annexed to the deed, and signed by the grantors and various other persons. (The original of this deed was produced, duly acknowledged.) The articles declare that the association was formed for the purpose of keeping a house of public entertainment on the southernmost end of Long beach, in the county of Monmouth.

14. A deed dated 4th May, 1827, from M. T. Wickham and James Baker, surviving trustees, to Jacob Alter, for the same property, described as "all that tract or piece of land, with the buildings and improvements thereon erected, (distinguished by lot number 18 in a certain plan or map of a larger tract of land known by the 'Southwesterly part of Long Beach,') situate in Monmouth county, in the state of New Jersey, containing about 194 acres, be the same more or less." The deed recites that the requisite majority of the shareholders of the association were in favor of selling the house, land, and all other property of the company at public sale at a time named, unless previously disposed of at private

sale; and that the company should be dissolved; and that it was sold at auction accordingly, to James Alter, for the sum of $1,750. (The original of this deed was produced, duly acknowledged.)

15. A deed dated 5th May, 1827, from Jacob Alter to Marine Tyler Wickham, Cornelius Stevenson, John Moore, George Wilson, James Baker, and Thomas Stroud, as tenants in common in fee, conveying the seme property. (Original produced, duly acknowledged.)

16. Various deeds and proceedings in partition, by which the title of the last six grantees was conveyed and transferred (or claimed to be so) to James Burk, to-wit: (1) A deed from James Stroud to Burk, dated 7th April, 1835, for his (Stroud's) one-sixth part of said property. (Original produced, duly acknowleged.) (2) A deed from Cornelius Stevenson to Burk, dated 31st December, 1835, for his (Stevenson's) one-sixth. (Original produced, duly acknowledged.) (3) A deed from the administrator of M. T. Wickham to said Burk, dated 16th November, 1835, for Wickham's sixth part. (Original produced, duly acknowledged.) This deed recites the order and proceedings of the orphans' court of Monmouth county, for the sale of the land to pay debts, but the order itself was not produced, and for this cause the deed was objected to. (4) A deed dated 1st May, 1837, from commissioners appointed to make partition of said property among the said six shares, conveying the whole property to said Burk. (Original produced, duly acknowledged.) The deed recites the proceedings and orders of three judges of the court of common pleas of Monmouth county for the partition and sale of the land; but the said proceedings and orders were not produced, and for this reason the deed was objected to. Burk is shown to have had a tenant in the property by the name of William Ivins, in 1835, or about that time, down to about 1839.

The next muniment of title is—

17. A deed dated 28th June, 1839, from James Burk to David Good, for the entire property. (Original produced, duly acknowledged.)

18. David Good died in June or July, 1840, leaving a widow and three children, his heirs at law, namely, Rachel Ann, wife of Charles Baeder, the now plaintiff; Matilda, wife of Jonas Bowman; and John S. Good. The title of the other heirs was duly conveyed to the plaintiff by various mesne conveyances, the originals of which were produced, duly acknowledged, namely: A deed from John S. Good to Charles Baeder, dated February 12, 1866, for his third part; and several deeds from the heirs of Matilda Bowman, executed in 1874 and 1875, except one of said heirs, who conveyed to one Bullock in 1884, and Bullock conveyed to the plaintiff, and Charles Baeder conveyed the interests transferred to him to one Taylor, who reconveyed the same to the plaintiff.

It thus appears that the plaintiff's father, David Good, and his family, (including the plaintiff,) and finally the plaintiff herself, have had the ostensible title to the property since June, 1839. David Good left a will, executed in Pennsylvania, in presence of only two witnesses, by which he devised the property to his wife for life, with remainder to his children. The latter seem to have acquiesced in this will during their moth-

er's life-time. She died in 1862. If to this period we add that during which James Burk claimed the ownership, it carries us back to 1835, 50 years before the invasion of the proprietors and their grantee, the defendant. And Burk's title, barring some imperfections in the records, ordinarily requisite to validate conveyances by administrators and commissioners in partition, is regularly deduced from John Chapman's representatives in the partition made in 1818, (namely, the Newbolds and Shreves,) to whom was allotted lot No. 18 as set off in that partition, which includes the premises in question. Chapman was one of the grantees of James Haywood in 1762, and Haywood received title from the West Jersey Society in 1751. The title of the society is claimed under the various deeds from Daniel Cox and his mortgagees or trustees, made in 1692. The claim of Cox is founded on the resolutions of the proprietors in 1690, and the survey made in 1691. So that there has been a constant claim of title, with undoubted color of title, to the property in question, adverse to the proprietors of East New Jersey, for nearly 200 years past, and an almost perfectly connected chain of conveyances of undoubted validity for over 140 years. The alleged defects in certain links of the chain will be adverted to hereafter. In the mean time the question arising from alleged possession under claim of title, on the part of the plaintiff and her predecessors, will be examined.

Of course, it is difficult to produce actual proof of possession beyond the memory of man. We have, it is true, a gleam of historical evidence in the private act of the legislature passed the 27th of October, 1770. This act is entitled "An act to regulate the pasturing the lands, meadows, and islands in common, lying on and adjoining to a certain beach known by the name of 'Barnegat,' or 'Long Beach,' and for other purposes therein mentioned." There can be no shadow of doubt that the act refers to the property embraced in the Cox survey, including the lands in question. Its terms are in precise conformity to the then situation of the title as evinced by the deeds produced in evidence. It will be remembered that James Haywood had conveyed the property to twenty persons as tenants in common in 1762, eight years previous to the act. The names of certain of these grantees are mentioned in the act, in the appointment of managers for regulating the common use of the property. The preamble and first section are as follows:

"Whereas, the owners and proprietors of a certain tract of land, meadows, and islands, situate in the township of Statford and county of Monmouth, called 'Barnegat,' or 'Long Beach,' have by their petition set forth that the situation and circumstances attending said beach, meadows, and islands are such that they cannot conveniently be divided in the ordinary way by fences or ditches, by means whereof it is in the power of a few proprietors to greatly prejudice the said beach and meadows by overstocking the same, and receiving the whole profits to themselves; and praying a law to limit and regulate the pasturing said beach, islands, and meadows in common, which is but reasonable and just, therefore be it enacted by the governor, council, and general assembly of the colony of New Jersey, and it is hereby enacted by the authority of the same, that from and after the tenth day of May, which will be in the year of our Lord 1771, no possessor, owner, or their representatives shall

put on, or suffer to run at large on, said beach, islands and meadows a greater number of horses, horned cattle, sheep, or other stock, than in proportion to the quantity and quality of the lands, islands, and meadows he or they shall respectively hold, or be entitled unto."

The second section is as follows:

"And be it enacted by the authority aforesaid that it shall and may be lawful for the proprietors, owners, or their representatives to meet and assemble yearly on the fourth Tuesday in October, at the now dwelling-house of Benjamin Randolph, in the township of Statford, or any place to be hereafter appointed by a majority of the said proprietors, owners, or their representatives, met and assembled, and then and there choose three managers to regulate the pasturing said beach, islands, and meadows, which managers shall be and are hereby invested with power to enter upon said beach, islands, and meadows, view the same, and to limit and proportion the number of horses, horned cattle, sheep, or other stock each proprietor or owner shall put on or let run at large on said beach, islands, and meadows in proportion to the quantity and quality of the same."

The following sections provide for branding the increase of the stock with the mark of the respective owners, and authorize the managers to erect pounds for that purpose, impose penalties for violation of the regulations, and provide means of collecting the same by sale of stock, etc., and prescribe other duties of the managers as to keeping records, accounts, etc. The sixth section enacts "that *Anthony Sykes*, *William Newbold*, and *John Leonard* are hereby appointed managers for the ensuing year, and so to continue till such time as others are chosen in their room." The eighth section declares that the waters surrounding "all that beach island called 'Barnegat,' or 'Long Beach,' and also the waters which surround a certain island called 'Beach Island,' lying and being next unto and on the north of Long beach, shall be deemed a lawful fence around each of said islands, so as to support any action of trespass for any trespasses committed or done on those islands, or either of them; and that all trespassers within those premises shall be subject to the like penalties as are inflicted by the laws of this province on trespassers on any of the inclosed lands within this colony." From the antiquity of this act I have no doubt of its competency as proof that the lands therein described were used and occupied by the then claimants to the title thereof, and that they claimed the land as their own. This evidence is also *prima facie* proof, unless the contrary appears, that the land continued to be occupied and possessed by the owners thereof, according to its quality and adaptations.

The proceedings in partition which took place in 1818 (as well as intermediate conveyances of portions of the land) tend to the same conclusion, namely, that it was never abandoned by the persons claiming to own the same, but continued to remain in their possession. But, coming down to later times, within the memory of living men, we have the testimony of John D. Thompson, 80 years of age, that he lived on Long beach in 1834, in the company's house, which, he thinks, was built about 1830, and stood right south of Bond's house. The company referred to was either the Long Beach Sea-Shore Company or the

associates who then owned the property as grantees of James Alter, in his deed executed in May, 1827. They were M. T. Wickham, Cornelius Stevenson, John Moore, George Wilson, James Baker, and Thomas Stroud. The house is specially mentioned in the deed to Alter, executed just previously, namely, in May, 1827. Thompson, testifying, more than 50 years afterwards, undertakes to give the names of some of the company. He mentioned James Hickey, John W. Moore, Henry Shively, John Wilson, and Mr. Baker. Of course it is obvious that the persons he came in contact with may only have represented the owners. He states that he agreed with the Long Beach Company for the house; agreed with James Hickey, who was the property man; paid rent to William Ivins, who lived in the house after Thompson. (Hickey was probably the agent of the owners.) In 1835, as we have seen, some of the part owners sold out to James Burk, and in 1837 he purchased all the interests at commissioners' sale. Ivins, who received rents from Thompson, became tenant of Burk. An agreement between him and Burk in respect to the occupancy of the premises was produced in evidence. Thompson says that Ivins afterwards moved to Barnegat, and died there, and he (Thompson) was his administrator. He says that he found Ivins there (in the house) when he (Thompson) took possession in 1834; and after the season, he left Ivins in possession, and he (Ivins) resided there until he went to the Mansion of Health House, Manahawkin, in 1838, two years before his death; and that he died in 1840. After witness left, some year or so, Ivins sold out to a lawyer by name of Jones, who moved there, and Ivins moved to the Mansion of Health. There is a little confusion in Thompson's statements, but not more than would naturally be expected from an old man half a century after the events. It is clear from his testimony that the property was occupied by the ostensible owners, under the conveyances produced, from about 1830 to 1839; and the recitals in the deeds show that it was occupied and a house built on it several years before 1830, probably as early as 1824. The map made by the commissioners of partition in 1818 shows a house on the land at that time, occupied by a person by the name of Horner. The nature of the land was such that it was probably only used as a place for summer resort, or for pasturing cattle during certain seasons of the year. In regard to such lands, a continuous *pedis possessio* is not necessary to maintain the owner's possession in law, sufficient to antagonize all trespassers.

In 1839 Burk conveyed the property to David Good, and his family have claimed to own it ever since. We have the testimony of David Good's son, John S. Good, who was born, as he says, in 1823, and was therefore 16 years old when his father purchased the land. He testifies that after his father's death (in 1840) he several times visited the place with his mother; that it was then owned by his mother. (It has been seen that David Good devised the property to his wife for her life; and the children, no doubt, recognized her right to it, although the will, being witnessed by only two witnesses, was not a valid devise in New Jersey. She had a right of dower in it at all events.) John S. Good

says he thinks that Lloyd Jones was in possession when his mother owned it. He says that they (he and his mother) sometimes staid there two or three weeks at a time; that they were there three or four times. His recollection is somewhat indefinite. But it is clear that the family always continued to claim the property as their own. Living in Pennsylvania, and not able in those times to derive much income from the property, they may have let it lie unused for many years. There is no evidence on this point. But this did not deprive them of their right to it, or of their legal possession as against all trespassers. Certainly the Board of Proprietors of East New Jersey had, least of all, any right to disturb them, or to interject a party into possession, and thus place them in the position of being obliged to make out strict title after peaceable private ownership of the property for many generations. In my judgment there was a legal possession of the property, under color of title, in the plaintiff, and those whose estate she acquired, for a much longer period than 20 years, and the defendant has not shown an adverse possession for a sufficient period to overcome the *prima facie* right of the plaintiff. This conclusion is arrived at independently of any alleged defects in the documentary title produced by the plaintiff, and therefore the rule to show cause why a new trial should not be granted must be discharged without regard to those alleged defects.

It will be more satisfactory, however, to examine the objections made by the defendant to the documentary title of the plaintiff. The first general objection relates to the deeds and grants by which Daniel Cox derived title to the two shares of propriety of East Jersey, under which the survey of 1691 was made, and to those by which he and his mortgagees conveyed his and their interests to the West Jersey Society. Several of these deeds were never entered upon the East Jersey records at all, and were not entered on those of West Jersey until 1754. It is objected, for one thing, that these deeds were not acknowledged or proved. But no law required them to be acknowledged or proved. The regulation of the original concessions and agreement of Berkeley and Carteret, with regard to the acknowledgment and proof of deeds, referred only to conveyances between private persons; and no other regulations went into effect prior to the surrender, except the act of 1699, which did not make any change in this matter, being substantially a mere repetition of the concessions. The deeds in question were among a large lot of deeds and papers, 71 in number, which remained in the repositories of the West Jersey Society, in the secretary's office in London, without having been placed on record, from the early part of William and Mary's reign to the middle of last century. They were then sent to this country to their agent here, after being registered and recorded in the office of a notary public in London, carefully identified by the oaths of the secretary and notary, taken before the lord mayor of London, and by the oath of the captain of the ship that brought them over, taken before the honorable James Alexander, and indorsed on each deed, and were then recorded in Book M of Deeds for West Jersey, as they principally related to property in that division of the province. They were ancient deeds. Sixty years

had passed away since their execution. There was then no method by which they could be authenticated except that which was adopted, namely, to prove in the most indubitable manner that they came from the society's archives, the proper custody to which they belonged, and to place them on the public records. They not only came from the proper custody, but they were conformable to the possession and claim of the property to which they referred. Their existence and validity were fully recognized by the proprietors of East Jersey themselves in the Elizabethtown bill and the schedules annexed thereto; and no stronger act of possession could have been exercised over the shares than was exercised by the West Jersey Society in that transaction. This is conclusive, and renders further discussion unnecessary. I am entirely satisfied that the records of these deeds were properly received in evidence.

The act of 1743, referred to by counsel, did not stand in the way of recording these deeds. The first section of that act declared that certain acknowledgments or proofs theretofore taken should be deemed sufficient to authorize the deeds to be recorded. It did not declare that no other proof should be insufficient. The second section clearly did not refer to such a case as that presented by the deeds in question.

I have not overlooked the fact that the deeds referred to were not recorded in the East Jersey office, but in that of West Jersey. If this were a question between those claiming under these deeds and subsequent purchasers without notice, the want of registry in East Jersey might be a material circumstance; for such purchasers would have a right to say, "We are only bound to know what was on record in East Jersey." But the question is a very different one. It relates to the existence of the deeds,—to the inquiry whether there ever were such deeds. That fact may be determined, in proper cases, even by oral testimony, if the witnesses have seen the deeds, know their contents, and the signatures of the parties. The proof of ancient deeds, especially if of such great antiquity as those in question, may be made in various ways. If conformable to the history and possession of the property to which they relate, slight evidence will suffice. In the present case, according to the recorded proof, the deeds came from the proper custody in 1754, and were authenticated in the only way in which they could then be authenticated, and were then recorded in West Jersey, where the property to which they related was principally situated; and all this a hundred and thirty years ago, and the property always claimed and possessed in conformity thereto, and their validity admitted by parties adversely interested. Under such circumstances it seems to me that the records were *primâ facie* proof of the former existence of the deeds.

The next material objection raised to the plaintiff's derivation of title is the non-production of the conveyance by John Chapman of his one-twentieth interest in the Long Beach property. This is alleged to have been made to the extent of three-fourths of said interest by a deed executed and bearing date the 8th of October, 1772, as before mentioned. Such a deed is recited in the deed from William and Clayton Newbold, and Benjamin, Caleb, and Reuben Shreve to Deacon and Haines, dated

the 4th day of March, 1823, more than 60 years before the defendant, under the East Jersey proprietors, undertook to take possession of the land. Under the circumstances of the case it seems to me that this recital is admissible to prove the existence of the deed in question. The Newbolds and Shreves claimed the Chapman share under the deed of 1772. They were evidently parties to the partition of 1818. The two Newbolds claimed the outstanding fourth part of Chapman's share by reason of having paid the proportion of the expenses of the partition due from said fourth part. Then they make the deed of 1823, and another deed for their right, title, and interest in the outstanding quarter. These acts of ownership, taken in connection with the previous history of the property, amount to such proof of possession as to clothe their deeds of 1823 with the character of a deed by parties in possession claiming title, and to confer upon their successors in the title and possession a right to the presumption that the deed of 1772 was executed and did exist as recited in the deed of 1823; such presumption also resting for support on the great lapse of time which has intervened. It seems to me that such a presumption (not of law, but of fact, and liable to be met by opposing proof) may reasonably and justly be raised against a trespasser having no title, or against the general proprietaries, who parted with their title long before. The same observations will apply to the supposed quitclaim deed of Benjamin Gibbs, dated 20th December, 1775, which is recited in the deed for one of the shares of the division, or a portion thereof, given by George Sykes to Thomas P. Sherborne, Jr., before referred to.

The proceedings in partition in 1818 are next objected to, because the original petition to the judge, and his order thereon, for the appointment of commissioners, was not produced. I assume that these papers could not be found. We have, however, the report of the commissioners, showing what they did in dividing the property and allotting the different parts to the shares in severalty, with a map of the premises and of their allotments, and the order of the judge directing the report to be filed. I think that this is competent evidence, under the circumstances, taking into consideration the lapse of time, and the possession of the property in conformity with the division.

We next come to the claimed transfer of title from Wickham and others (six in all) to James Burk, in 1835–37. The deeds for two of the shares (Stroud's and Stevenson's) are unimpeachable. Then there is a deed from the administrator of Wickham, under the order of the court, to sell land for payment of debts, but the order and proceedings are not produced, though recited in the deed. Is that sufficient? I am of opinion that the case is not aided by the statute of 1864, (Revision, N. J. 1045.) That statute refers to officers, or auditors in attachment, acting in pursuance of a decree, judgment, execution, or order of a court, and declares that their deeds, duly acknowledged, etc., shall be *prima facie* evidence of the recital therein. I do not think that an administrator can be called an officer. The question, then, is whether the recital in an administrator's deed of an order of sale 40 or 50 years after

the date of the deed, is sufficient presumptive proof of such an order; the possession of the property being conformable to the deed. In my judgment it is. The argument that the petition and order are necessary to the jurisdiction is not sufficient. Of course they are necessary to the jurisdiction. But what is necessary to prove that they were made is a question of evidence. And after a lapse of 40 or 50 years, I think that the recitals of the deed are evidence of the facts recited, other things concurring. The same remarks will apply to the deed of the commissioners in partition made to Burk in May, 1837. I consider the transfer of title to Burk as *prima facie* proven.

I believe these are all the material objections to the documentary title of the plaintiff. The result is that said title is maintained to three undivided fourths of the property in question, no title except that of possession being shown for the outstanding fourth part of John Chapman's interest in the Long Beach property. But if I should be mistaken with regard to the validity of the documentary title, the view which I have taken with regard to the possessory title requires a decision against the motion for a new trial. The rule to show cause, therefore, is discharged. A rule will be entered to that effect.